IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| 2018 BLUE ISLAND LLC ) | Case No. 20-21563 |
| ) | |
| Debtor. ) | Hon. Jack B. Schmetterer |
| ) | |
| ) | |

**DECLARATION OF ANDREW BELEW IN SUPPORT OF CHAPTER 11 CASE**

I, Andrew Belew, hereby declare under penalty and perjury.

1. I am the current President and Chairman of Better Housing Foundation, Inc., an Ohio not-for-profit company ("BHF"). BHF is the sole member of eight separate limited liability companies, each of which owns portfolios of affordable housing units. One such portfolio is the above-captioned debtor, 2018 Blue Island LLC (the "Debtor").

2. BHF is also the manager of Debtor. The Debtor's day-to-day operations are managed by Consilium Capital Partners LLC ("Consilium"). Since its founding in 2012, Consilium has managed over 5,000 multifamily units in high growth markets across the United States. I am the sole member and managing director of Consilium. As such, I am familiar with the Debtor's operations, day-to-day business, affairs, and books and records. I submit this Declaration to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of this Chapter 11 case.

3. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussion with present and former board members of BHF, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtor's

operation and financial condition. In making this declaration, I have relied, in part, on information and materials that the prior owners of BHF have gathered, prepared, and provided to me.

4. BHF was formed in 2015 for the purpose of acquiring portfolios of affordable housing in the greater Chicago area, including the Debtor, which has properties in the southwestern suburb of Blue Island, Illinois. The Debtor is the owner of "Portfolio E." In addition to the Debtor, BHF is the sole member of seven (7) other not-for-profit entities that own portfolios of affordable housing units:

    a. "Portfolio A" consisted solely of Lindran Properties, LLC (Shoreline), The assets of Portfolio A were sold and transferred to a third-party purchaser pursuant to 11 U.S.C. § 363(b). The Portfolio A Chapter 11 case was dismissed on November 3, 2020.

    b. "Portfolio B" consists of the properties owned by BHF Chicago Housing Group B LLC, which is currently a debtor-in-possession in a Chapter 11 case pending as Case No. 20-12453. The assets of Portfolio B were sold and transferred to a third-party purchaser pursuant to 11 U.S.C. § 363(b).

    c. "Portfolio C" consists of the properties owned by BHF Chicago Housing Group C LLC, which is currently a debtor-in-possession in a Chapter 11 case pending as Case No. 20-16567. The assets of Portfolio C were sold and transferred to a third-party purchaser pursuant to 11 U.S.C. § 363(b).

    d. "Portfolio D" consists of the properties owned by 2017 IAVF Windy City Fox Run LLC, 2017 IAVF Windy City Parkside LLC, 2017 IAVF Windy City Shaddle LLC, and 2017 IAVF Windy City Villa Brook LLC, which are currently debtors-in-possession in jointly administered Chapter 11 cases pending as Case No.

20-18377. On December 4, 2020, the assets of Portfolio D were sold at an auction and a sale hearing is scheduled for December 15, 2020.

(collectively, Portfolio A, Portfolio B, Portfolio C, and Portfolio D shall be the "Affiliated Entities"). None of the assets of the Debtor or any Affiliated Entities are cross-collateralized with any asset of any other Affiliated Entities. Neither the Debtor nor BHF are a guarantor for any of the Affiliated Entities.

5. The current BHF Board assumed control of the Debtor, the Affiliated Entities, and BHF on November 26, 2018.

**The Current Debtor is Distinguishable from Portfolios A-C and Continues to Provide Affordable Housing**

6. The Debtor is financially, geographically, and physically distinguishable from the other debtor portfolios: Portfolio A, Portfolio B, and Portfolio C (collectively, "Portfolios A-C"). All of the properties owned by Portfolios A-C were located on the south side of Chicago, were in a dilapidated condition when the current BHF Board assumed control, and had state court appointed receivers in possession and control of the respective real property at the time of the respective bankruptcy filings. None of these conditions are attendant with the Debtor. The Debtor has high occupancy rates, does not have receivers in place, and is, generally, in good condition.

7. The Debtor was formed as a single-purpose entity in 2018 for the purpose of acquiring 25 buildings located in Blue Island, Illinois, consisting of 347 units of which 345 are separate affordable housing residential units (the "Property"). The remaining two units are commercial units consisting of a daycare and a minimarket.

8. The Debtor's acquisition of the Property was financed by the issuance of $25,025,000 of secured bond obligations consisting of $19,600,000 of Series 2018A-1 Multifamily Housing Revenue Bonds (Better Housing Foundation Blue Station Portfolio Project); $2,495,000

3

of taxable Multifamily Housing Revenue Bonds (Better Housing Foundation Blue Station Portfolio Project), Series 2018A-2; and $2,930,000 of Subordinate Series 2018B Multifamily Housing Revenue Bonds (Better Housing Foundation Blue Station Portfolio Project) (collectively, the "Bonds"). The Bonds were issued pursuant to a Trust Indenture dated as of May 1, 2018 (the "Indenture"), between the Illinois Finance Authority (the "Issuer") and Wilmington Trust, N.A., the original Bond trustee (the "Prior Trustee"). UMB Bank, N.A. is the duly-appointed and acting successor trustee (the "Trustee") under the Indenture.

9.     The Bonds are secured, in part, by a Loan Agreement dated May 1, 2018 (the "Loan Agreement") between the Issuer and the Debtor. The proceeds of the Bonds were loaned to the Debtor, then under the control of a prior board, pursuant to the Loan Agreement. The Loan Agreement and related loan documents were assigned to the Trustee to secure the repayment of the Bonds. The Bonds are also secured, in part, by a certain Mortgage, Security Agreements and Financing Statement dated May 1, 2018 (collectively, the "Mortgage"), between the Debtor, as mortgagor, and the Prior Trustee, as mortgagee. The Mortgage and related mortgage documents have been assigned to the Trustee to secure repayment of the Bonds. The Trustee was granted a security interest in all the Debtor's buildings and improvements thereon.

10.    In early to mid-2019, in order to finance rehabilitation and repair costs incurred by Portfolio A, the Debtor made unsecured loans to Portfolio A and Portfolio B. At the times the loans were made, the Prior Trustee was the duly appointed trustee under the Indenture. Specifically,

    a.     The Debtor loaned $590,909.14 in principal amount to Portfolio A; and

    b.     The Debtor loaned $121,063.29 in principal amount to Portfolio B.

11. The aforementioned loans are evidenced by promissory notes that were executed contemporaneously when the aforementioned loans were made. The Debtor previously entered into a waiver agreement waiving its claims against Portfolio A and Portfolio B, knowing there would be no chance for recovery. Indeed, Portfolio A was sold for $3,900,000 and the trustee of Portfolio A was owed over $16,000,000. Portfolio B was sold for $18,625,000 and the trustee of Portfolio B was owed over $56,000,000. The Trustee was not provided notice of the execution of the waiver agreement until after the waiver agreement was executed. The Trustee never consented to the execution of the waiver agreement. The waiver agreement is without prejudice to the rights of the Trustee to assert claims against Portfolio A, Portfolio B and/or the Debtor.

**The Debtor's Continued Operations as a Provider of Affordable Housing**

12. The Debtor's business model, as established by prior ownership, was flawed at the onset. The Debtor believed it would be exempt from paying real estate taxes because of their not-for-profit status. However, this material miscalculation by prior ownership permanently burdened the Debtor with insufficient capital. Once prior ownership recognized it was required to pay real estate taxes, which aggregate to over $550,000 per year, its carry cost increased and the funds available to maintain the Property decreased even further. As a result of the need to attract new capital, the prior ownership sought outside guidance.

13. In August of 2018, a non-profit entity named Invest in America's Veterans Foundation ("IAVF"), took control of the BHF Board with the intent to operate, stabilize and rehabilitate the Property. By that time, BHF's previous board members resigned in full. In November of 2018, IAVF informed me that as a result of what they learned during their due diligence, they felt they did not possess the knowledge, experience or capital to properly achieve this ambitious objective. Based on my background in dealing with distressed real estate, I believed

5

my team possessed the skill set to rehabilitate the Property. We agreed to take over the BHF Board on November 26, 2018. By taking over BHF, we intended to improve BHF and its holdings, including the Debtor, and to enhance our resume as an enterprise specifically designed to assist other struggling, non-profit, real estate entities.

14. Once my team took over control, we began to turnaround the operations of the Debtor and increase occupancy of the Property. Shortly after my assumption of control of BHF, I authorized the employment of Paper Street Realty, LLC ("Paper Street"), the property management company selected by prior ownership, to continue managing the day-to-day operation of the Property.

15. Unfortunately, Paper Street badly mismanaged the Property and, in July 2019, I terminated Paper Street's employment as property manager for the Debtor. Prior to turning over control of the Debtor's operations, Paper Street absconded with more than $277,000 of the Debtor and Portfolio D's money. The Debtor and Portfolio D have filed suit to recover these funds from Paper Street, and Paper Street has filed counterclaims against the Debtor and Portfolio D. The Debtor is in the process of determining whether to remove the Paper Street action to Bankruptcy Court to resolve the matters contemporaneously with the disposition of the Debtor's real estate assets.

16. Following the termination of Paper Street, I appointed Consilium as property manager for the Property. I formed Consilium in 2012 and, since its founding, Consilium has managed over 5,000 multifamily units in high growth markets across the United States. At the time of Paper Street's dismissal, the occupancy for Property fluctuated between the low-to-mid 80% range. Since Consilium took over management for the Property, the occupancy for the Property has consistently remained over 90%, and is currently 94%.

17. Consilium is paid based solely on the Debtor's monthly gross revenue. Each month, Consilium receives an industry standard 3% of gross revenues with which it pays for, *inter alia*, all insurance for the Property. The Debtor, through Consilium, currently employs nine (9) full-time employees for the day-to-day management and maintenance of the Property. These employees consist of a property manager, an assistant property manager, leasing manager, and six (6) maintenance technicians.

18. The Debtor has three (3) bank accounts with Fifth Third Bank, a rent account, tenant security deposit account and operating account. Many, if not most, of the tenants at the Property will pay monthly rent by physically walking a paper check down to the on-site management site. The property manager will then use the on-site check scanner to directly deposit the check into the respective Debtor's rent account. Other tenants will pay through a direct deposit to the appropriate Debtor. The Debtor then transfers funds from the rent account to the operating account to timely pay accounts payable. As of December 15, 2020, the Petition Date, the Debtor currently had the following balances at Fifth Third Bank:

| Type of Account | Operating | Rent | Deposit |
|---|---|---|---|
| **Balance** | $87,844.80 | $319,129.78 | $180,141.43 |
| Acct No. | -2138 | -2104 | -2146 |

19. The employees are paid on a bi-monthly basis. The accounting and payroll services for the Property is done by Ascent Multifamily Accounting ("Ascent"). Ascent is an unrelated full-service outsourcing firm that focuses exclusively on accounting services for the apartment industry. Generally, the bi-monthly payroll is withdrawn from the Debtor's operating accounts two (2) days prior to the end of the payroll period and deposited with Ascent to fund and distribute payroll. Prior to the Petition Date, the Debtor fully funded all payroll liabilities for the payroll

period of October 1, 2020 to October 15, 2020.  Many of the Debtor's employees live paycheck to paycheck and Consilium wanted to ensure the employees would timely get paid without delay.

20. The Debtor averages monthly gross revenues of approximately $260,000. However, the monthly obligations under the Bonds is approximately $125,000.00, leaving just $135,000 to operate the entire Property, not including the reserves for the Bonds or any property tax payments.  Generally, the monthly operating costs for the Property exceed $200,000 per month. Additionally, the annual property taxes for the Property exceed $550,000, thereby eliminating any additional funds to operate the Property.  To exacerbate the situation, the 2020 real estate taxes are estimated to increase to over $800,000.  The Debtor cannot sustain any long-term financial stability without a sale of Property and restructuring of the debt secured against the Property.

**Debtor has Extensively Marketed the Property**

21. Over the past eighteen (18) months, in light of the Debtor's on-going financial instability, the Debtor has been actively involved in negotiating a transaction that would transfer ownership of the Property and stabilize the Property for the community and existing tenants.  Over the marketing period, the Debtor received six (6) letters of interest for the purchase of the Property (collectively, the "LOIs").  The various offers ranged from $11,100,000 to $15,088,000, with extreme variations on contingencies and due diligence requirements for the LOIs.

22. After months of negotiations, in consultation with the Trustee, the Debtor has entered into a stalking horse bid with Kinzie Assets, LLC, an Illinois limited liability company ("Kinzie"). Kinzie is an unrelated third party and has offered to buy the Property free and clear of liens, claims and encumbrances for $15,088,000, as adjusted for customary closing costs.  The Debtor also intends to hire Marcus & Millichap as a real estate broker ("M&M") to further market the Property during the bankruptcy cases.  The Debtor is hopeful that through M&M's vast

marketing network and those parties that showed an interest in the Portfolios A-D, in addition to those parties that submitted LOIs for the Property, the Debtor will have a robust marketing and sale process for the Property.

**The Purpose of This Bankruptcy Case is to Transition the Property to a New Owner**

23. The initial goal of the bankruptcy filing is to consummate a transaction, or a series of transactions under § 363 of the Bankruptcy Code with a third party, free and clear of liens, claims and encumbrances. The Debtor believes that by consummating this transaction they will be able to transfer ownership of the Property to new owners, without the existing bond debt, thus stabilizing the Property for the community and existing tenants.

24. The Chapter 11 case stands to protect the claims and interests of the Debtor's tenants, their creditors, the community, and other parties-in-interest.

25. The Debtor's goal in this Chapter 11 case are to achieve an orderly, efficient, consensual and successful transaction that maximizes the value of the Debtor's estate for the stakeholders and the tenants. I believe if the Court grants the relief requested in the sale hearing, the prospects of achieving those objectives and completing a successful transaction of the Debtor's assets will be substantially enhanced.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the forgoing statements are true and correct.

Dated: December __15__, 2020

_Andrew Belew_
ANDREW BELEW